UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
00-CV-2073(JMR/RLE)

Nancy Johnson, as legal guardian )
of K.M., a minor child )
)
v. ) ORDER
)
Independent School District No. 47 )

Defendant, Independent School District No. 47, serves Sauk Rapids, Minnesota, and its environs. The Sauk Rapids High School is a part of the District. Plaintiff, K.M., a special needs student, was enrolled at the school during the 1999-2000 school year.

This case arises from the school's seemingly-innocuous publication of its yearbook. It has devolved into a case in which plaintiff claims she suffered peer sexual harassment at the school, as well as a number of injuries under state law. It is a case where the Court, in the end, concludes that, while children are not always kind, their unkindness does not always rise to a compensable federal claim. As a result, defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is hereby granted.

I. Background

This case developed during plaintiff's junior year. Thomas Blair was the school principal; Mary Kathryn Sorenson was the school yearbook advisor. Joleen Koopman was plaintiff's school case manager. Jon Leintz was another school case manager.

FILED 4-5-02
RICHARD D. SLETTEN, CLERK
JUDGEMENT ENTERED 4-5-02
DEPUTY CLERK'S INITIALS ______

Plaintiff played the flute in the school band. In mid-September, 1999, three yearbook staff members approached plaintiff in the band room and asked if they could take her picture for the yearbook. She agreed, but asked that the picture be "clean."

As they left the band room, the yearbook staff members said "one time at band camp . . . ," and asked plaintiff if she had ever attended band camp. She said she had no idea what they were talking about. They told her the quote was from the movie "American Pie" and suggested she see it.[1] Plaintiff denies she gave them permission to use the quote with her picture, and that she knew they might use the quote in conjunction with her photo. The staff indicates plaintiff gave her consent. When plaintiff arrived home that evening she asked her older sister what the quote meant. Her sister explained the reference and urged plaintiff not to see the movie.

Following the photo session, plaintiff claims she was verbally harassed by two fellow students -- "R.R." and "B." According to plaintiff, R.R. spoke to her approximately 20 times between mid-

---

[1]"American Pie" is a widely-distributed "comedy" film which, although R-rated, was targeted at a youthful audience. Its plot focused on four male high school students nearing graduation and their efforts to become sexually-experienced on or before prom night. Relevant to this matter, however, was a female classmate who played flute in the school's band. Her recollection of events occurring at "band camp" constitutes a running joke throughout the film. Prominent amongst those recollections is one where she said she used her flute for self-pleasure.

September and December, 1999, making statements such as "Did you have fun with your flute last night?" and "Does it turn you on?" There is no record reference to any physical contact between plaintiff and either of the identified-students. The teasing primarily took place in the school hallways, out of the teachers' and administrators' sight.

Plaintiff states she reported the harassment to Ms. Koopman and Mr. Leintz in the fall of 1999, and was told "they would take care of it." Mr. Leintz and Ms. Koopman deny that plaintiff brought any specific concerns of any gender-based harassment to their attention in 1999. Instead, they claim plaintiff's only expressed concerns were characteristic of general teasing, such as teasing her for the loudness of her voice. Plaintiff, however, says she told each counselor about the "one time at band camp" quote, but is clear that she did not understand what it meant and did not tell the case managers about the words' sexual connotation. The case managers agree they did not understand what it meant either. After December, 1999, plaintiff states the teasing subsided, up until the events in May, 2000.

A. <u>Pre-Yearbook Distribution</u>

The record is not absolutely clear when the school staff learned that the words "one time at band camp" were printed within the text of the yearbook and the connotation of the phrase. According to plaintiff, she mentioned it in March; the staff claims

they were not informed until early May. In the final analysis, the Court does not consider the date to be dispositive. For purposes of this motion, the Court resolves the matter in favor of the non-moving party and assumes it to March, 2000. Radaszewski v. Telecom Corp., 981 F.2d 305, 310 (8th Cir. 1992), cert. denied, 113 S. Ct. 233(1993); Fed. R. Civ. P. 56.

Plaintiff says another student told her the phrase was the yearbook's band page title in March. Plaintiff states she told Ms. Sorenson she had heard it was the band page's title, and she did not like it or think it was appropriate. She did not tell Ms. Sorenson why it might be inappropriate, nor did she suggest to a school staff member that the phrase might caption her photograph. It appears the yearbook was composed on a computer, and plaintiff asked Ms. Sorenson to show her the computer's version of the band page. Because this request occurred between classes, and time was short, Ms. Sorenson promised she would look at it later. Plaintiff agrees that Ms. Sorenson did so, and the viewing showed the band camp page was not titled "one time at band camp."

In May of 2000, shortly after speaking with plaintiff about the yearbook, Ms. Sorenson discussed plaintiff's concern with Brenda Kipka, her predecessor as yearbook advisor. Ms. Sorenson asked Ms. Kipka if she thought "one time at band camp" was inappropriate. Ms. Kipka said the reference seemed normal, but Leah Thompson, a student teacher, overheard the conversation and

explained the sexual context of the phrase,[2] and opined that the phrase would be inappropriate.

Later in May, 2000, plaintiff learned "one time at band camp" was going to be next to her picture in the yearbook. She told Ms. Sorenson, but by this time the yearbook had gone to the publisher and was printed and bound. Faced with this reality, Ms. Sorenson and Ms. Kipka discussed possible ways to address the caption, which they now understood to be inappropriate.

Ms. Kipka told Ms. Sorenson she had used "stickers" in the past. In her deposition, Ms. Sorenson testified that stickers were:

> the best option, that we could cover the caption, that there would be no embarrassment to [K.M.], that students wouldn't know. And in the past, they [students] have not paid attention to the stickers and it would be the only way that students could get their books, which they had paid for.

Ex. 2, at 82. Ms. Sorenson also consulted with Mr. Blair about the situation and possible solution. Ms. Sorenson said she felt distributing the books on schedule with a nearly imperceptible

---

[2]This is, apparently, the first time the school staff knew of the theme or subject of the "American Pie" film. The Court does not consider this surprising. The Court takes judicial notice of the fact that, while the movie was in general distribution for several months around the time involved in this case, it was not directed at adult audiences. Shortly after hearing the instant motion, the Court rented and viewed the film for the first time (much to the shock of the Court's children, who were fully conversant with the film and the context of "one time at band camp.")

correction would minimize attention to plaintiff. Sanders Aff., Ex. A. Ms. Sorenson telephoned the yearbook printing company and asked about stickers that could not be removed, and if removed, would leave an opaque residue which would render the underlying phrase illegible. Stickers were then ordered.

When the yearbooks and stickers arrived, Ms. Sorenson tested a sticker on the roll they came on, checking to see if it could be peeled off. She did not test it on the yearbooks themselves. She then met with the yearbook student staff and told them plaintiff's picture caption was unacceptable and would have to be changed by placing stickers over the caption. The yearbook staff was reminded that this information should not be discussed with the student body. The stickers were applied in a locked room, and Ms. Sorenson and another adult double-checked every book. The yearbooks were then distributed; seniors received their yearbooks on May 19, followed by general distribution on Monday, May 22.

On Friday, May 19, the teasing resumed. Plaintiff testified that she saw a senior looking at a yearbook in which the caption could be read, and that several students, whom she could neither recognize nor name, teased her about it. She saw students in the hallway removing the stickers to expose the original caption by her picture which upset her. She discussed the situation with Ms. Koopman and Mr. Leintz, who told her to discuss it with her mother.

B. Post-Yearbook Distribution

On May 22, 2000, plaintiff and her mother, Nancy Johnson, met with Mr. Blair to convey their displeasure about the yearbook situation. Ms. Johnson told him the stickers had only drawn more attention to the caption near her daughter's photo. She asked why she was not contacted about the decision to use stickers, and requested that the yearbooks be recalled. Ms. Sorenson and Mr. Blair reviewed their decision process with Ms. Johnson and plaintiff, reiterating that the yearbook had already been printed when they learned of the nature of the problem, and that the stickers had worked successfully in the past.

Mr. Blair asked plaintiff for the names of the students who had teased her. K.M. said she could not tell him because there were too many, and she did not know their names. Mr. Blair apologized and offered the school's help. He suggested a follow-up meeting on May 24, and recommended that Ms. Johnson explore filing a harassment charge through the school's Title IX officer.

When plaintiff received her yearbook, her mother was able to peel away the sticker allowing her to read the original caption. The next day, plaintiff showed Ms. Sorenson that the sticker could be peeled off, after which Ms. Sorenson directed plaintiff to Mr. Blair. Plaintiff spoke to Mr. Blair the next day, May 23. She also states that on May 23 she was subjected to increased teasing about band camp and her flute.

On May 24, Ms. Johnson, plaintiff, and the school staff met once again. They discussed things the school might do to remedy the situation. Ms. Johnson said the stickers were not working, and again Mr. Blair asked her to consider meeting with the Title IX officer, or alternatively, he would consider disciplining the students if he knew who they were.

The meeting became acrimonious, and Ms. Johnson began to scream and swear at Mr. Blair. He asked her to stop interrupting him and stop acting in an accusatory manner, because they were meeting to attempt to help her daughter. When Ms. Johnson continued, he asked her to leave. Before she left, she informed Mr. Blair that plaintiff would not be returning to the school.

Plaintiff did return, however, but only to complete her finals in Ms. Koopman's room. She wrote notes to several people in the school, including one to Mr. Blair, which said:

> Mr. Blair: Hey there buddy!! Thanks for getting me to be student of the month this month and last year. I can't even think about next year. I am going to be in 12th grade, my last year of school. Yes, I am scared, but I'll do fine and make it through the hard times. Your (sic) a great and cool person. Your kindness makes me feel like a better student. I am kinda sad that my school year will be coming by soon and it will be over no time. But I just want to say thanks for everything. Have a good summer!!

Plaintiff now states she met with a therapist at the end of May complaining she was distraught and subject to panic attacks. The therapist's notes do not refer to panic attacks. They refer,

instead, to multiple concerns, including desiring more freedom from her mother, missing her father, and the yearbook situation.

## II. Analysis

### A. Summary Judgment

Defendants seek summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). As the Supreme Court noted, "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).

The party opposing summary judgment may not rest upon its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. Id. at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992). If the opposing party fails to carry this burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. Celotex, 477 U.S. at 322; Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268 (8th Cir. 1988).

B. <u>Title IX</u>

This case arises from incidents occurring in a school which are claimed to be related to a child's education. As such, the plaintiff seeks relief under Title IX of the Education Amendments of 1972. 20 U.S.C. § 1681 <u>et seq.</u> Title IX provides, in relevant part, that:

> . . . no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

In construing Title IX, the United States Supreme Court has considered circumstances under which a school district can be held liable for damages resulting from harassment. The Court has determined a school district can be liable only if it has (1) actual notice or knowledge of the behavior; (2) acts with deliberate indifference; and the (3) harassment is so "severe, pervasive, and objectively offensive" that it effectively bars the victim's access to educational opportunities or resources. <u>Davis v. Monroe County Bd. Of Educ.</u>, 526 U.S. 629, 642, 652 (1999).

The <u>Davis</u> Court emphasized its holding "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. . . ." Instead, the Court held "the recipient [educational institution] must merely respond to

known peer harassment in a matter that is not clearly unreasonable." Id., at 648-649. The Court specifically found summary judgment appropriate in cases where the court can "identify a [school district's] response as not 'clearly unreasonable' as a matter of law." Id., at 649.

This Court has viewed all of the facts of the case from the standpoint of the plaintiff, and considers them established for purposes of this motion. After having done so, the Court applies the Davis standards and guidance and finds that -- while in a perfect world the events in this case would not have occurred -- the school district and the school were not "'clearly unreasonable' as a matter of law." Id. The Court, therefore, finds plaintiff has not met her burden under Title IX, and summary judgment in favor of defendant is appropriate.

1. Severity of Harassment

The Supreme Court has recognized that "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998)). The harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Davis, at 633.

In making this declaration, the Davis Court recognized that in

schools, unlike the adult workplace, students may interact in ways which would be unacceptable among adults. Davis, at 651. These behaviors might include "insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." Id. But the Court carefully noted that such student-to-student actions would not ordinarily rise to the level of a Title IX claim. Instead, the Court noted that "[p]eer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." Id., at 653.

Davis was a case in which a fifth grade female student was subjected to a prolonged pattern of sexual harassment lasting between December, 1992, and May, 1993. This included a male classmate attempting to touch her breasts and genital areas; the male stating "I want to feel your boobs," and "I want to get in bed with you." The classmate put a doorstop in his pants and acted in a sexually suggestive manner toward her, rubbing his body against her in the school hallway in a sexually suggestive manner. The harassing male engaged in similar behaviors with other girls in the class. His conduct led to criminal charges and a plea to sexual battery.

In Davis, notwithstanding notice given to school personnel, the educational staff made no effort to investigate, take disciplinary action, or even separate the students. The school district neither had a policy nor any training in peer sexual

harassment. School personnel failed to "respond in any way over a period of five months" to the complaints of either the plaintiff or other female students. Davis, at 1674. The Davis plaintiff claimed her grades dropped and she had written a suicide note. Id., at 634. The Supreme Court found those facts constituted severe, pervasive, and objectively offensive conduct, particularly given the offensive touching. Id., at 653.

In the present case, however, the words plaintiff heard were not facially offensive. It is clear that neither she nor the school's staff, when initially informed of the words, clearly understood their meaning. She identified two male students who teased her about playing the flute and using it in a sexual manner, but there is no evidence suggesting they made any physical contact. She in fact has offered no evidence of any offensive physical touching.

There is no question that the yearbook contained the words "one time at band camp" near her picture. And it is also true that the school staff tried -- perhaps ultimately unsuccessfully -- to cover the words by applying an adhesive sticker. These events are unfortunate, and likely painful, to a young girl. But at the same time, the Court finds as a matter of law that they do not rise to the level of "severe, pervasive, and objectively offense[ive]"

conduct which must be present in order to maintain a Title IX claim.[3]

Beyond a failure to show the requisite severity of conduct, the Court cannot find evidence sufficient to raise a question of fact showing the incidents had the "systemic effect of denying [K.M] equal access to an educational program or activity." Davis, 526 U.S. at 653. To the contrary, she received the school's May, 2000, student-of-the-month award. She delivered thank you notes to her teachers, including one to Mr. Blair, thanking him for all that he had done for her. Although in the course of this litigation she reported having panic attacks,[4] she was able to complete her finals

[3]The events in this case must be viewed in the context of other cases where Title IX claims have been sustained. See, e.g., Vance v. Spencer County Public School District, 231 F.3d 253, 259 (6th Cir. 2000) (female student was repeatedly propositioned, groped, threatened, stabbed in the hand; student-perpetrator removed her shirt, pulled her hair, took his pants off and told her he would have sex with her); Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1248-49 (10th Cir. 1999) (disabled female student was sexually assaulted; the incident was discovered by a school-janitor who saw the perpetrator assaulting the victim in a secluded area; the janitor told the students to clean up the blood and vomit, returned them to class, told the teacher what happened, and the teachers merely tied clothing around the victim's waist to cover the blood on her clothing, and told the victim not to tell her mother and to forget it ever happened); Soper v. Hoben, 195 F.3d 845, 854-55 (6th Cir. 1999)(female student was raped, fondled, and harassed by male classmate at school).

[4]The therapist's notes are highly equivocal in this regard and do not refer to panic attacks. They do, however, show plaintiff was bothered by the yearbook situation, as well as familiar teenage difficulties, such as missing her father, feeling disliked by more "popular" kids, and her view that she was restricted in her freedom to socialize with friends -- particularly boys. Ex. 9.

at school. When plaintiff and her mother met with school administrators to complain about the yearbook, the school's sexual harassment policy was explained to them, and they were urged to use it. After all of these events, plaintiff and her mother decided that she would attend her senior year at a different school.

On these facts, the Court cannot find a factual basis on which a reasonable jury could find plaintiff's harassment to be so severe, pervasive, and objectively offensive that it systematically barred her from equal access to the school's educational program.

2. Notice

In Davis, the Supreme Court suggested the school received adequate notice when the parent and student made repeated complaints of harassment to the teacher and principal. In this case, plaintiff has offered evidence showing she complained of the teasing to her teacher, Ms. Koopman, in December, 1999.

But viewed objectively, it is clear her complaints were extraordinarily vague. Plaintiff, herself, testified she did not explain that the quote was the source of the teasing, nor did she explain what it meant. It is undisputed that Ms. Koopman did not understand or know of any sexual connotation in the "band camp" quote. In March, 2000, plaintiff states she more specifically complained to Ms. Sorenson about the possible "band camp" caption of the yearbook's band page.

From this evidence, it is highly problematic that the school

had legally sufficient notice of a possible sexual harassment issue until March, 2000, at the earliest. For purposes of this motion, however, the Court will assume plaintiff has satisfied her burden of showing that the appropriate school personnel, at some point, had actual knowledge.

3. Deliberate Indifference

Even assuming defendant received adequate notice, the pivotal issue remains: Did defendant act with deliberate indifference? Deliberate indifference exists "only where [the defendant]'s response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. This standard does not give victims a right to particular remedial demands, nor ensure that students conform their conduct to certain rules. See id., at 648-649; see also Wilson v. Beaumont Independent School Dist., 144 F. Supp.2d 690, 693 (E.D. Texas, 2001) (holding there is no legal requirement of perfection in appropriate action by school personnel). Or, as noted above, the deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment, or that administrators must engage in particular disciplinary action...." Davis, 526 U.S. at 648. On this record, the Court finds, as a matter of law, that plaintiff has failed to meet her burden of establishing defendant's deliberate indifference.

As stated above, plaintiff did not reveal -- because she may well not have perceived -- the sexual nature of the teasing. It is clear that it was only after she told Ms. Sorenson, who learned from Leah Thompson, that the school staff knew of the quote's offensive connotation. Once the staff knew of the problem's dimension, the staff immediately undertook efforts to correct it. Ms. Sorenson changed the band page's title, but unfortunately did not notice whether or not the quotation was being used elsewhere. Ms. Sorenson took prudent action commensurate with the amount of information she possessed.

Once the school staff knew plaintiff's picture-caption had an offensive connotation, Ms. Sorenson again acted thoughtfully. She asked the previous yearbook advisor, Ms. Kipka, for her opinion regarding possible solutions, which resulted in a decision to use a previously successful one -- the stickers. She contacted the yearbook publisher about the stickers, who agreed that they would solve the problem. While in hindsight this remedy might have been insufficient, it was a reasonable action at the time.

Further, Mr. Blair, upon learning of the teasing to which plaintiff was subjected, attempted to investigate the situation, asking for the names of students involved. Plaintiff repeatedly refused to provide the names. When later faced with an angry parent, he offered the services of the school's Title IX coordinator, explained the process of a harassment complaint,

offered to file a harassment complaint, or to do something else to help alleviate plaintiff's stress. It was plaintiff and her mother who chose not to avail themselves of these options.

The fact that Ms. Johnson did not agree with the school's remedies, and instead commanded that yearbooks be recalled and reprinted, neither illustrates nor suggests that defendant was deliberately indifferent to the problem. As set forth in Davis, the deliberate indifference standard does not give aggrieved parties a right to particular remedial demands. See Davis, at 648-649; see also Wilson v. Beaumont Independent School Dist., 144 F. Supp.2d 690, 693 (E.D. Texas, 2001) (holding there is no legal requirement for perfection in appropriate action by school personnel).

The school faced a problem; once it knew of the nature and dimension of the problem, the staff attempted to solve it. The solution to the "band camp" quote may have been imperfect, but their efforts to secure the solution do not demonstrate deliberate indifference. After the yearbook's publication, when plaintiff and her mother were unsatisfied with the school's chosen solution, the school administration sought additional information concerning possible harassment -- which plaintiff declined to provide -- and offered the services of the school's Title IX coordinator, or to assist plaintiff and her mother in filing a complaint. The defendant's actions are simply not deliberately indifferent. The

plaintiff has failed to present a triable issue on this question.

As a result, summary judgment is granted in favor of defendant on this federal claim.

C. Remaining State Law Claims

Having resolved the federal claim in this case, plaintiff's claims for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress remain. Each is a state claim. Although a district court may exercise supplemental jurisdiction over state law claims that arise from the same nucleus of operative facts as plaintiff's federal claims, the Court does not have to exercise it if it has "dismissed all claims over which it has original jurisdiction." 8 U.S.C. § 1367(c)(2). See also Franklin v. Zain, 152 F.3d 783, 786 (8th Cir. 1998).

In this case, there remain no claims over which the Court has original jurisdiction; the remaining claims implicate only state law. The Court, therefore, declines to exercise its supplemental jurisdiction in this matter.

III. Conclusion

Defendant's motion for summary judgment is granted on plaintiff's Title IX claim. The Court declines to exercise its discretion to accept jurisdiction over the supplemental claims, and opts to dismiss them, without prejudice, pursuant to 28 U.S.C. § 1367 (c)(3).

Accordingly, based on the findings of fact, conclusions of law, all the files and records herein, and for the reasons stated above, IT IS ORDERED that:

1. Defendant's motion for summary judgment is granted, and plaintiff's Title IX claim is dismissed with prejudice.

2. Plaintiff's state law claims are dismissed without prejudice.

Dated: April 4, 2002

JAMES M. ROSENBAUM
United States Chief District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd